UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DOUGLAS PAUL KENEFICK, and WHITNEY MARIE HILL,<br><br>Defendants. | 5:19-CR-50058-JLV<br><br>REPORT AND RECOMMENDATION REGARING DEFENDANTS' MOTIONS TO SUPPRESS (DOCS. 53, 55) |

Pending is Defendants' Motions to Suppress. (Docs. 53, 55). A hearing was held on Tuesday, October 1, 2019. Mr. Kenefick and Ms. Hill were personally present and represented by their attorneys of record, Thomas E. Harmon V. and Jordan D. Bordewyk, respectively. The Government was represented by the Assistant United States Attorney Gina S. Nelson. Two witnesses testified at the hearing, and three exhibits were received into evidence. Supplemental briefing concluded on December 16, 2019. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

**<u>RECOMMENDATION</u>**

It is respectfully recommended that Defendants' Motions to Suppress (Docs. 53, 55) be denied.

1

**JURISDICTION**

Mr. Kenefick is charged in an Indictment with Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A) and Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. §§ 922(g)(1), (3) and 924(a)(2). (Doc. 29). Ms. Hill is charged in an Indictment with Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A). Id. The pending Motions were referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

**FACTUAL BACKGROUND**

In June of 2018, Detective Sayles with the Rapid City Police Department received information from Source of Information ("SOI") #1 regarding Mr. Kenefick, including general information about the location of his residence. (Doc. 77 at p. 6; Ex. 3 at p. 6). SOI #1 further stated that Mr. Kenefick traveled to Arizona, Montana, Colorado, and California approximately every other week to purchase marijuana. (Doc. 77 at p. 7).

In October of 2018, the same SOI disclosed the exact address of Mr. Kenefick and provided information that Mr. Kenefick was driving to the border of Mexico, near California, to purchase narcotics. Id. SOI #1 disclosed having personally been to Mr. Kenefick's home where he observed three and a half pounds of methamphetamine and having previously seen Mr. Kenefick with up to five pounds of methamphetamine. Id. at p. 8. SOI #1 further disclosed that

Mr. Kenefick had a safe in the bedroom of his house where he stored the narcotics. Id.

In January of 2019, an investigator with the Unified Narcotics Enforcement Team ("UNET") spoke with Confidential Informant ("CI") #1 who stated Mr. Kenefick sold marijuana by the pounds and methamphetamine by the ounces. Id. CI #1 also provided an address for Mr. Kenefick, which corroborated the address provided by SOI #1. Id. at p. 9.

In February of 2019, CI#2 advised Mr. Kenefick was making monthly trips to California to pick up large quantities of methamphetamine and marijuana. Id. at p. 9-10. The CI purported to have first-hand knowledge, having taken trips with Mr. Kenefick to California to purchase drugs and stated he/she had personally seen Mr. Kenefick with thirty or more pounds of marijuana and over a pound of methamphetamine. Id. at p. 10.

In March of 2019, SOI #2 provided information that implicated an individual by the name of "Grandpa Kurt," but all information provided identified "Grandpa Kurt" as being synonymous with the identify of Mr. Kenefick. Id. at p. 11-12; (Ex. 3 at p. 7). SOI #2 disclosed Mr. Kenefick went on trips to California every four to six weeks to purchase around thirty pounds of marijuana and multiple pounds of methamphetamine. (Doc. 77 at p. 11; Ex. 3 at p. 7). The same SOI stated he/she personally attended a trip to San Ysidro, California where Mr. Kenefick purchased around $25,000 in marijuana and $12,000 worth of methamphetamine. (Doc. 77 at p. 11-12; Ex. 3 at p. 7). SOI #2 stated the contraband was packed in four duffle bags, three of which

were filled with marijuana and the fourth which was filled with methamphetamine. (Ex. 3 at p. 7). SOI #2 disclosed after this event, he/she again went on another trip with Mr. Kenefick, just a few weeks later, where they picked up two large duffle bags of marijuana. Id. SOI #2 described the drug runs as usually lasting about four days in duration from the time they left Rapid City until the time they arrived back to Rapid City. Id.

In April of 2019, CI #3 stated they personally purchased methamphetamine from Mr. Kenefick several times. (Doc. 77 at p. 14). The same CI also disclosed they knew Mr. Kenefick drove to Northern California, Colorado, and Montana to pick up marijuana and Southern California to pick up methamphetamine. (Ex. 3 at p. 8). CI #3 also stated Mr. Kenefick drove a burnt orange colored Saturn Vue with dealer plates and believed Mr. Kenefick would be traveling to California in the near future to purchase a large quantity of methamphetamine. (Doc. 77 at p. 14-15).

On April 4, 2019, law enforcement obtained a search warrant to attach an electronic tracking device on the burnt orange Saturn Vue. Id. at p. 16. On April 15, 2019, at approximately 10:30 p.m., the electronic tracking device indicated the vehicle left Rapid City and was heading Southwest, towards what law enforcement believed was a destination of California. Id. at p. 16-17; (Ex. 3 at p. 8). On April 16, 2019, the tracking device indicated the vehicle was in Casper, Wyoming. (Doc. 77 at p. 18). Wyoming law enforcement was able to confirm Mr. Kenefick was driving the Saturn Vue and discovered he was traveling with a female passenger, later identified as Ms. Hill. Id. The vehicle

arrived in San Ysidro, California on April 18, 2019, and law enforcement in California positively identified Mr. Kenefick and Ms. Hill in the Saturn Vue and staying in a motel in San Ysidro. Id. at p. 19-20. After arriving in California, law enforcement observed the vehicle pull into the "Mexico Only" lane where the tracker equipment shut off.[1] Id. at p. 20. On April 19, 2019, the electronic tracking device indicated the vehicle began traveling back towards South Dakota. Id. at p. 21.

Investigator Mason and Lieutenant Oxner both testified that while the Saturn Vue was en route back to South Dakota, law enforcement officers in Wright, Wyoming again positively identified the Saturn Vue in a parking lot, with Mr. Kenefick in the driver seat and Ms. Hill standing outside the vehicle talking on her phone. Id. at p. 23, 58. After leaving Wright, Wyoming, law enforcement positively identified Mr. Kenefick as the driver and Ms. Hill as the passenger and continuously surveilled the vehicle until it crossed into the boundary of South Dakota. Id. at p. 58. Neither visual surveillance, nor the tracking device, indicated the Saturn Vue stopped again before crossing the boundary into South Dakota, leaving the impression to law enforcement that Mr. Kenefick was still the driver. Id. at p. 23-25, 58. Lieutenant Oxner testified that before the vehicle entered the boundaries of South Dakota, Trooper Thomas and himself each independently ran a check on Mr. Kenefick and discovered his driver's license was expired. Id. at p. 59-60. Lieutenant

---

[1] Law enforcement testified that they are not allowed to enter Mexico to continue surveillance, which is why the tracker equipment shut off. (Doc. 77 at p. 20).

Oxner testified he was asked to develop his own probable cause to pull over the Saturn Vue after it entered South Dakota, but stated he was going to pull over the vehicle regardless based on the drug investigation and traffic violation. Id. at p. 60-62.

On April 20, 2019, Lieutenant Oxner conducted a traffic stop on the Saturn Vue near Spearfish, South Dakota. Id. at p. 63-64; (Ex. 3 at p. 9). Mr. Kenefick was the driver and Ms. Hill in the passenger seat. (Doc. 77 at p. 63-64; Ex. 1 at 5:15). Lieutenant Oxner testified he fabricated an excuse for pulling over the vehicle, telling Mr. Kenefick and Ms. Hill that another vehicle had called them in for following too closely.[2] (Doc. 77 at p. 65). Lieutenant Oxner testified that upon approaching the vehicle, Ms. Hill's whole body was shaking, she was eating gummy worms as fast as she could, and there was a baggie sticking out of the top of her shirt which appeared white and to contain a dark brown or green substance. Id. at p. 65-66. When asked what was in the bag, Ms. Hill shoved the baggie further inside her shirt and kept ahold of it with her hand. Id. at p. 66).

Eventually, Ms. Hill turned over the baggie, which contained what she claimed was a THC brownie. Id. at p. 67. A field test later revealed the brownie contained 28 grams, or approximately 1 ounce, of heroin. Id. Ms. Hill also turned over a keychain pill container which contained a small amount of marijuana. Id. at p. 71. Ms. Hill's purse contained a marijuana pipe, a bag

---

[2] Lieutenant Oxner further testified that despite the "following too closely" violation being a ruse, he still falsified documents by issuing Mr. Kenefick an authentic written warning. (Doc. 77 at p. 83).

6

containing approximately 3.6 grams of methamphetamine, and 4 or 5 Alprazolam pills that were not contained in a prescription bottle. Id. A subsequent search of the vehicle yielded tinfoil in the driver's side door pocket, containing approximately 21 grams of methamphetamine, and approximately ten pounds of methamphetamine in a suitcase located in the back of the vehicle. Id. at p. 71-72. The results of the vehicle search and drug investigation formed the basis for the affidavit in support of the search warrant which was granted for Mr. Kenefick's house. (Ex. 2; Ex. 3).

## DISCUSSION

Mr. Kenefick filed the present Motion to Suppress in which he argues: there was no traffic violation to support the stop of the vehicle; the search exceeded the scope and purpose of the stop; and Mr. Kenefick's statements and the resulting search warrant of his home were fruit of the poisonous tree. (Doc. 54). In Ms. Hill's Motion to Suppress, she argues to suppress: evidence seized from the traffic stop, statements she made during the traffic stop, statements she made during the subsequent interrogation by law enforcement, and a urine sample she provided. (Doc. 55). In her supporting memorandum, Ms. Hill argues law enforcement lacked reasonable suspicion to stop the vehicle and all resulting evidence should be suppressed. (Doc. 56 at p. 4-6). Furthermore, she argues statements she made during a subsequent interrogation are fruit of the poisonous tree and must be suppressed. Id. at p. 6-7.

The Government opposes both Motions, responding there was probable cause to conduct the traffic stop based on the knowledge of Mr. Kenefick's

expired driver's license. (Doc. 61 at p. 6-10). The Government further asserts the search of the vehicle was valid because law enforcement observed a plastic baggie sticking out of Ms. Hill's shirt, which she admitted shortly thereafter, was a brownie containing a controlled substance. Id. at p. 13. The Government responds the search was permissible both as an inventory search and under the automobile exception to the warrant requirement. Id. Furthermore, the Government asserts Ms. Hill does not have standing to challenge the vehicle search as a mere passenger. Id. at p. 10-11. Finally, the Government states the fruit of the poisonous tree doctrine fails because there was no violation of the Fourth Amendment. Id. at p. 14-16.

## I.     Probable Cause Existed to Stop the Vehicle

The Fourth Amendment of the U.S. Constitution provides the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. In terms of the Fourth Amendment, the law is settled that "a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" Brendlin v. California, 551 U.S. 249, 255 (2007) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)). "For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest. . . . As such, a traffic stop is governed by the principles

8

of Terry v. Ohio . . . ." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984); Terry v. Ohio, 392 U.S. 1 (1968)).

Therefore, to be valid pursuant to the Fourth Amendment, a traffic stop "must be supported by reasonable suspicion or probable cause." United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008) (internal citations omitted).

> A law enforcement officer has reasonable suspicion when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed. The more rigorous standard of probable cause exists when the totality of the circumstances justifies the belief that a crime has been committed and the person being seized committed it.

Id. (internal quotations omitted). "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. This is true even if a valid traffic stop is a pretext for other investigation." United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted). Pursuant to South Dakota Codified Law regarding traffic violations, "[n]o person . . . may drive any motor vehicle upon a highway in this state unless the person has a valid driver license under the provisions of this chapter. Any person convicted for a violation of this section is guilty of a Class 2 misdemeanor." S.D.C.L. § 32-12-22.

In this case, Lieutenant Oxner conducted a lawful traffic stop. In Wright, Wyoming, law enforcement observed the burnt orange Saturn Vue parked and Ms. Hill outside talking on the phone while Mr. Kenefick was in the driver seat, shortly before leaving the area and continuing back to South

9

Dakota. (Doc. 77 at p. 23). After leaving Wright, Wyoming, law enforcement positively identified Mr. Kenefick as the driver and Ms. Hill as the passenger and continuously surveilled the vehicle as it crossed into the boundary of South Dakota. Id. at p. 58. Lieutenant Oxner testified he and Trooper Thomas both independently ran a check on Mr. Kenefick before the traffic stop was conducted and discovered he had an invalid driver's license. The court finds this testimony to be credible.[3]

Lieutenant Oxner testified that both law enforcement's visual surveillance as well as surveillance via the tracking device on the vehicle indicated the vehicle continued driving, without stopping, from the time Mr. Kenefick was confirmed as the driver in Wright, Wyoming, through the time the vehicle crossed the boundary into South Dakota. Id. at p. 23-25. This gave Lieutenant Oxner probable cause to believe Mr. Kenefick was still the driver,[4]

---

[3] Mr. Kenefick incorrectly states, "No information was presented to the Court that [Lieutenant Oxner] ran a query on Mr. Kenefick's driver's license status prior to 11:13 p.m. [the time at which Mr. Kenefick's driver's license was ran immediately following the traffic stop] on April 20, 2019." (Doc. 78 at p. 2). Mr. Kenefick contradicts himself by admitting, "[Lieutenant] Oxner testified that he looked up Mr. Kenefick's driver license status prior to stopping the vehicle." Id. at p. 7. Specifically, Lieutenant Oxner testified, "Trooper Thomas and I both individually ran Mr. Kenefick through our mobile MDT, and found that his license was eligible to reinstate, so he did not have one to drive." (Doc. 77 at p. 59). When asked if Lieutenant Oxner was aware that Mr. Kenefick had an expired driver's license *before* the stop, he responded, "Yes, that's correct." Id. at p. 60. Trooper Thomas did not testify at the hearing to corroborate this testimony. Although no *independent* evidence was presented verifying if Lieutenant Oxner or Trooper Thomas ran a search on Mr. Kenefick's driver's license prior to the traffic stop, the court finds Lieutenant Oxner's testimony credible on this point.

[4] Mr. Kenefick states, "No evidence was presented confirming Mr. Kenefick was driving the tracked vehicle prior to being stopped by law enforcement upon its entering into South Dakota on April 20, 2019." (Doc. 78 at p. 1). However, law enforcement testified at the hearing, "And when [Kenefick and Hill] left [Wright, Wyoming], they identified Mr. Kenefick as the driver and Ms. Hill as the passenger. And they had eyes on that vehicle all the way from that point to until it came into the state of South Dakota." (Doc. 77 at p. 58). Law enforcement further testified that "based on surveillance and the tracker activity" there were no stops to their knowledge, and the vehicle travelled continuously from the time Mr. Kenefick was identified as the driver until the traffic stop was conducted in South Dakota. Id. at p. 23-25. The court

10

despite it being dark outside, and stop the vehicle for the traffic violation, regardless of the pretextual purpose regarding law enforcement's desire to search for contraband. See Sallis, 507 F.3d at 649. See also Whren v. United States, 517 U.S. 806, 806 (1996) (holding "constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved"). Accordingly, a South Dakota traffic violation occurred when Mr. Kenefick, who was driving without a valid driver's license, crossed the Wyoming border into South Dakota.

Both Lieutenant Oxner and the Government were candid that Lieutenant Oxner had been asked to develop his own probable cause for the stop, but would have conducted a traffic stop on the vehicle regardless, because they believed probable cause already existed based on the drug investigation and traffic violation. (Doc. 77 at p. 42, 47, 60). Because the court finds there existed independent probable cause for the traffic stop due to the expired driver's license, the court need not discuss whether probable cause existed regarding the drug investigation.

Lieutenant Oxner further testified he told Mr. Kenefick he had pulled him over because law enforcement received a call that Mr. Kenefick was following too closely. Id. at p. 78. Lieutenant Oxner admitted this was a ruse to pull over the vehicle because no other traffic violation occurred besides the expired driver's license. Id. at p. 64. Lieutenant Oxner explained that he fabricated

---

finds this testimony credible and finds it to be a highly reasonable inference that Mr. Kenefick would still be the driver after he was confirmed driving a vehicle that made no further stops.

the excuse to pull over Mr. Kenefick because it would have been suspicious to tell Mr. Kenefick he had been pulled over for an expired driver's license when it was too dark to view the identify of the driver at the time of the traffic stop.  Id. However, a traffic stop pursuant to a "ruse" does not violate the Fourth Amendment rights of the driver where a traffic violation which has already occurred, however minor, already provides independent probable cause for the stop.  See United States v. Prokupek, 632 F.3d 460 (8th Cir. 2011); Sallis, 507 F.3d at 649; S.D.C.L. § 32-12-22.  Accordingly, probable cause existed to conduct a traffic stop on the Saturn Vue.

## II.     Ms. Hill Has No Standing to Challenge Search of the Vehicle

A defendant challenging a search has the burden to establish "that [she] personally has an expectation of privacy in the place searched, and that [her] expectation of privacy is reasonable . . . ."  Minnesota v. Carter, 525 U.S. 83, 88 (1998).  The challenger must prove that the expectation of privacy is subjectively reasonable and objectively reasonable, "that is, one that society is willing to accept."  United States v. McCaster, 193 F.3d 930, 933 (1999). "Generally, a mere passenger does not have standing to challenge a vehicle search where he has 'neither a property nor a possessory interest in the automobile.'"  United States v. Anguiano, 795 F.3d 873, 876 (8th Cir. 2015) (quoting Rakas v. Illinois, 439 U.S. 128, 148 (1978)).

Here, there are no facts to conclude that Ms. Hill had ownership or a possessory interest in the vehicle.  See United States v. Barragan, 379 F.3d 524, 530 (8th Cir. 2004) (holding a passenger whose "name did not appear on

12

any ownership documents and . . . did not have an ownership interest" in the vehicle lacked standing to challenge the search of the vehicle"). Furthermore, Ms. Hill fails to prove any facts demonstrating she had a reasonable expectation of privacy in the vehicle or was anything more than a mere passenger. See Anguiano, 795 F.3d at 876. Because Ms. Hill was a mere passenger, she had no legitimate expectation of privacy in the vehicle, and accordingly, has no standing to challenge the search.[5] See Rakas, 439 U.S. at 143. However, even if Ms. Hill had standing to challenge the search, her Motion to Suppress would still fail on the merits, as the stop and search of the vehicle were constitutional.

### III.  Probable Cause Existed to Search the Vehicle

"It is well settled that a warrantless search of an automobile is not unreasonable if law enforcement officers have probable cause to believe that the vehicle contains evidence of criminal activity." United States v. Daniel, 809 F.3d 447 (8th Cir. 2016) (citing United States v. Ross, 456 U.S. 798, 823-24 (1982)). "Probable cause exists when the facts available to an officer would warrant a person of reasonable caution to believe that contraband or other evidence of a crime is present." Daniel, 809 F.3d at 448-449 (internal citations omitted). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may

---

[5] Ms. Hill correctly cites to case law referencing a passenger's ability to challenge a *stop* of a vehicle. (Doc. 79 at p. 6-8). However, the traffic stop was supported by probable cause resulting from Mr. Kenefick's expired driver's license. Because she was a mere passenger, Ms. Hill is incorrect in alleging she has standing to challenge the *search* of the vehicle. Id. at p. 6.

conceal the object of the search." United States v. Englehart, 811 F.3d 1034, 1042 (8th Cir. 2016) (internal citations omitted).

     Lieutenant Oxner testified that after the vehicle was pulled over, Ms. Hill appeared extremely nervous, was shaking, and eating gummy worms as fast as she could. (Doc. 77 at p. 65). The patrol vehicle does not show footage of Ms. Hill in the vehicle to confirm or deny this testimony. (Ex. 1). Lieutenant Oxner further testified that when Mr. Kenefick was brought back to the patrol vehicle he did not seem nervous, but rather appeared "very calm and actually tired" but his "inside appearance was conflicting" due to "the artery in his neck . . . pounding through the traffic stop . . . ." (Doc. 77 at p. 68-69). The court has reviewed the patrol video which provides footage of Mr. Kenefick sitting in the patrol vehicle. The video does not corroborate Lieutenant Oxner's testimony that Mr. Kenefick was internally conflicted or nervous in any manner, but rather, shows him calmly talking with Lieutenant Oxner, even casually laughing with the officer, and at times, falling asleep while left alone in the patrol vehicle. (Ex. 1). Furthermore, Mr. Kenefick's expired driver's license alone, while providing probable cause to conduct a traffic stop, was not probable cause to search the vehicle. See Arizona v. Gant, 556 U.S. 332, 344 (2009) (holding there was no probable cause to search a vehicle where "[Defendant] was arrested for driving with a suspended license—an offense for which police could not expect to find evidence in the passenger compartment of [Defendant's] car").

     However, probable cause did exist to search the vehicle, because, prior to

the search, Ms. Hill handed over the baggie sticking out of her shirt, stating it contained a THC brownie. (Doc. 77 at p. 67). It was this admission by Ms. Hill that provided probable cause for law enforcement to search the vehicle for "offense-related evidence." <u>Arizona</u>, 556 U.S. at 344. Although the patrol video audio does not confirm this conversation, the court finds Lieutenant Oxner's testimony on this fact credible. Furthermore, neither Mr. Kenefick nor Ms. Hill contested that Ms. Hill admitted to having contraband on her person. Additionally, the brownie field-tested positive for 28 grams of heroin.

Because probable cause existed to search the vehicle, the court need not address the fruit of the poisonous tree doctrine. Therefore, admissions by Mr. Kenefick and Ms. Hill and the search warrant for the residence, granted from the contraband seized from the vehicle, were also valid, and not fruit of the poisonous tree.

## **CONCLUSION**

For the foregoing reasons, it is respectfully recommended that the Motions to Suppress (Docs. 53, 55) be denied.

## **NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the

District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

    DATED this 15th day of January, 202.

                                            BY THE COURT:

                                            DANETA WOLLMANN
                                            United States Magistrate Judge