UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>DOUGLAS PAUL KENEFICK and WHITNEY MARIE HILL,<br><br>                Defendants. | CR. 19-50058-JLV<br><br>ORDER |

**INTRODUCTION**

     A grand jury indicted defendants Douglas Paul Kenefick and Whitney Marie Hill on charges of conspiring to distribute methamphetamine and, for Mr. Kenefick, possessing a firearm as a felon.[1]  (Docket 29).   Each defendant moved to suppress evidence obtained during an April 20, 2019, traffic stop and vehicle search, as well as other pieces of evidence they allege are derived from the stop. (Dockets 53-56).   The government opposes the motions.   (Docket 61).

     The motions were referred to Magistrate Judge Daneta Wollmann for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and the court's April 1, 2018, standing order.   The magistrate judge conducted an evidentiary hearing on the motion to suppress on October 1, 2019.   (Docket 66).   She took testimony from two witnesses and received three exhibits into evidence. (Dockets 35 & 36).   The parties filed post-hearing briefing.   (Dockets 73, 78 &

---

[1] The court refers to Mr. Kenefick and Ms. Hill as "defendants" in the collective and by their individual names otherwise.

79). The magistrate judge then issued a report and recommendation ("R&R") concluding the suppression motions should be denied. (Docket 81). Defendants each timely objected to the R&R and the government responded to their objections. (Dockets 88, 91 & 95).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. For the reasons given below, the court adopts the suppression R&R, as modified by this order. The court denies defendants' suppression motions.

I. **Defense Objections**

As summarized by the court, defendants' objections contend the magistrate judge erred by:

1. Finding credible Lieutenant Matt Oxner's ("Lt. Oxner") testimony that he discovered Mr. Kenefick was driving without a valid South Dakota driver's license prior to the vehicle stop.[2] (Dockets 88 at pp. 1-3 & 91 at pp. 2-5).

2. Finding credible Pennington County Sheriff's Investigator Thad Mason's ("Inv. Mason") testimony that law enforcement

---

[2]Mr. Kenefick only objects to the magistrate judge's credibility determinations, but argues her legal analysis is dependent on the credibility finding. (Docket 91 at p. 2).

2

> continuously surveilled defendants between Wright, Wyoming, and the stop location.   (Docket 91 at pp. 4-5).

3. Holding probable cause existed to stop the vehicle.   (Docket 88 at pp. 3-5).

4. Concluding Ms. Hill, as a passenger, had no standing to challenge the vehicle search.   Id. at pp. 5-7.

The court overrules each objection in turn.

No party objects to the magistrate judge's factual findings.   The court adopts them in full.   (Docket 81 at pp. 2-7).   The court will not restate those facts here, but will refer to the R&R and other record materials as necessary.

## II.   Analysis

### A.   Officer credibility

The court reviews the magistrate judge's credibility findings de novo. United States v. Lothridge, 324 F.3d 599, 600-01 (8th Cir. 2003) (rejecting review for clear error); Taylor v. Farrier, 910 F.2d 518, 521 (8th Cir. 1990).   The court is not required to "rehear the contested testimony[.]"   United States v. Raddatz, 447 U.S. 667, 674 (1980).   In weighing the officers' credibility, the court reviewed the suppression hearing transcript, the parties' filings and the exhibits received at the suppression hearing, including the dash camera video from the vehicle stop.   The court concurs in the magistrate judge's credibility determinations.

#### 1.   Lieutenant Oxner

At the suppression hearing, Lt. Oxner testified he and another law enforcement officer, South Dakota Highway Patrol Trooper Andrew Thomas,

3

entered Mr. Kenefick's name into a law enforcement database and found his driver's license was suspended.  (Docket 69 at pp. 59-60).  Lt. Oxner testified he ran Mr. Kenefick's name before the stop.  Id. at pp. 60, 89-90.  The magistrate judge credited this testimony.  (Docket 81 at p. 10 n.3).  Relying on Lt. Oxner's testimony, she concluded Mr. Kenefick violated South Dakota law, giving law enforcement probable cause for the stop.  Id. at pp. 10-11.

Defendants assert Lt. Oxner's testimony was not credible.  They rely on defense counsel's argument at the suppression hearing that only one "printout" recording Lt. Oxner's use of the license database exists.  (Dockets 88 at pp. 1-2 & 91 at p. 3).  Both defendants also assert Lt. Oxner's admitted lies to them regarding the reason for the vehicle stop, as well as the "falsified" warning document he issued to Mr. Kenefick, undermine his credibility.  (Dockets 88 at pp. 2-3 & 91 at pp. 3-4).  Ms. Hill highlights the magistrate judge's finding that another portion of Lt. Oxner's testimony was inconsistent with video evidence.  Id. at pp. 2-3.  Mr. Kenefick asserts Lt. Oxner's tardiness in writing a report about the stop undermines his credibility.  (Docket 91 at pp. 4-5).

Defendants' strongest argument pertains to the lack of documentation of a pre-stop license check.  At the suppression hearing, defense counsel confronted Lt. Oxner with a printout documenting that he accessed the relevant law enforcement database at 11:13 p.m. on April 20—after the stop commenced.[3]

---

[3]Although it appears the printout was produced to the defense in discovery, it is not in evidence.  The court has not reviewed it.

(Docket 69 at pp. 86-87). Lt. Oxner conceded he did not have any record to show he accessed the database before the stop. Id. at p. 87. On redirect, Lt. Oxner testified he did not know if he was able to print the first database query "because it's not attached to a case number. Id. at p. 90. He also testified, however, that he "probably could" generate documentation of a query after the stop was concluded. Id. at p. 91.

The court concludes the lack of documentation for the first query casts more doubt upon the government's preparation for the suppression hearing than Lt. Oxner's credibility. No party questioned Lt. Oxner as to any policy for printing query records. The court does not know whether it is standard procedure to print a copy of every query to the database, but the apparent ability to print a query after the fact would make such a policy unnecessary. Cross-examination did not uncover any reason why Lt. Oxner would have contemporaneously printed a record of each query. The court sees no reason why the lack of a record for the first query would discredit Lt. Oxner.[4]

The need for government counsel to request a printout of the first query, on the other hand, was obvious, especially if the second printout was disclosed in

---

[4]Mr. Kenefick argues Lt. Oxner would not have needed to check his license status during the stop if he had already checked it before the stop. (Docket 91 at p. 4). Lt. Oxner testified he checked Mr. Kenefick's license status again while Mr. Kenefick was in his patrol vehicle "to make sure that he [didn't] have" a license. (Docket 69 at p. 68). Lt. Oxner was also reluctant to explain he knew Mr. Kenefick was driving without a license, because that could have revealed the police interest in the vehicle was based on more than a simple traffic violation. Id. at p. 64 ("[I]t's going to look a little suspicious if I tell them that I stopped them for no driver's license when it's 11:00 at night and it's dark out."). Lt. Oxner had logical reasons for querying the database twice.

5

discovery. See Docket 61 at p. 5 (raising Mr. Kenefick's lack of a driver's license as probable cause for the stop one and a half months before the suppression hearing). The court cannot explain why the government failed to request a printout. While it is certainly possible government counsel failed to obtain a printout because none exists, a simpler explanation is that counsel was not diligent in preparing for the suppression hearing. In any event, counsel's failure to prepare does not bear on the credibility of Lt. Oxner's testimony.

Defendants next contend Lt. Oxner's lies on scene and his admitted production of a false document impeach his credibility. Lt. Oxner falsely told defendants he pulled them over for following another vehicle too closely. (Docket 81 at p. 6). He also issued a false written warning to Mr. Kenefick. Id. at p. 6 n.2. The problem with this argument is that Lt. Oxner was not required to be truthful with defendants during the stop. See Frazier v. Cupp, 394 U.S. 731, 739 (1969) (police deception "relevant" but "insufficient" to render confession involuntary); United States v. Spivey, 861 F.3d 1207, 1214 (11th Cir. 2017) ("The Fourth Amendment allows some police deception[.]"). Moreover, Lt. Oxner's deception did not extend into the legal proceedings; both he and government counsel were honest with defense counsel and the court that the following-too-closely story was a lie. Lt. Oxner's lies to defendants during the stop do not show his untrustworthiness as a witness on the stand.

Lt. Oxner also gave believable rationales for his on-scene lies. He explained that making a stop based on a traffic violation protects the integrity of

a drug investigation and lessens the danger of the stop. (Docket 69 at pp. 61-62). In this particular situation, it also allowed him to investigate Ms. Hill's role in the conspiracy. Id. at p. 62. Certainly, announcing to suspects in a vehicle—potentially with access to weapons—they were pulled over due to their involvement in a drug conspiracy could be extremely unwise. While Lt. Oxner could have executed his deception without issuing a false written warning, the court finds his deception during the stop does not impeach his testimony.

Ms. Hill, pointing to the R&R, asserts Lt. Oxner falsely testified in regard to Mr. Kenefick's demeanor during the stop and that this alleged lie taints his entire testimony. Lt. Oxner testified Mr. Kenefick's "outside appearance looked very calm and actually tired" but "his inside appearance was conflicting" because "the artery in his neck was actually pounding throughout the traffic stop" showing a higher "heart rate level . . . than what we normally see for somebody who's getting a warning or citation." (Docket 69 at pp. 68-69). The magistrate judge noted the dash camera video does not show Mr. Kenefick appearing "internally conflicted or nervous in any manner[.]" (Docket 81 at p. 14).

The court generally agrees with the magistrate judge's description of Mr. Kenefick's appearance in the dash camera video. But Lt. Oxner did not testify Mr. Kenefick was outwardly nervous. He testified that, despite Mr. Kenefick's outward calm, he believed Mr. Kenefick was nervous because an artery in his neck was pulsing. The court did not observe any visible pulsing artery in Mr. Kenefick's neck on the dash camera video. However, the video is taken in low

7

light and is not of a resolution high enough that one would expect to be able to discern a pulsing artery. See Hearing Ex. 1. The court does not find the video contradicts Lt. Oxner's testimony as to Mr. Kenefick's appearance.

Finally, Mr. Kenefick asserts Lt. Oxner cannot be believed because he wrote his arrest report two weeks after the stop and may have consulted with Unified Narcotics Enforcement Team ("UNET") officers before writing the report.[5] (Docket 91 at p. 4). The court is not convinced.

At the hearing, Lt. Oxner testified he wrote his report about the stop and arrest on May 3—approximately two weeks after the stop. (Docket 69 at p. 88). He explained that he does not necessarily write reports immediately after an arrest because they have a video record to rely on. Id. He also testified that a probable cause affidavit is written closer in time to a stop.[6] Id. Upon questioning by defense counsel, Lt. Oxner testified he did not recall how many times he met with UNET between the arrest and May 3. Id. at p. 89. He denied meeting with UNET to "Fourth Amendment proof [the] stop[.]" Id.

The amount of time between the stop and the date of the report, while less than ideal, does not raise suspicion about Lt. Oxner's testimony.[7] Nor does the possibility Lt. Oxner may have conferred with UNET before writing the report

---

[5]UNET is a group of South Dakota law enforcement agencies that investigates drug crimes. (Docket 69 at p. 5).

[6]Inv. Mason, on behalf of UNET, did request a search warrant on April 20, the date of the stop. Hearing Ex. 3. The probable cause affidavit included information about the stop. Id. at p. 9.

[7]Whether the time gap affects the credibility of the report is not at issue.

impeach his hearing testimony. The court notes there is little evidence, other than defense counsel's insinuations, that Lt. Oxner worked closely with UNET on this case. At a UNET briefing, Lt. Oxner was informed Mr. Kenefick would be arriving in South Dakota in an orange Saturn Vue with Ms. Hill and that there could be 10 pounds of methamphetamine in the vehicle. (Docket 69 at p. 56). Lt. Oxner testified he otherwise knows little about the underlying drug investigation. Id. at pp. 55-56. These facts do not speak to a relationship from which the court could infer that Lt. Oxner conspired with UNET to falsify his arrest report.

The court overrules defendants' first objection and finds Lt. Oxner testified credibly. The R&R is adopted as modified by this order.

### 2. Investigator Mason.

The court also rejects Mr. Kenefick's argument that Inv. Mason testified incredibly. He argues Inv. Mason's "equivocation" regarding whether Lt. Oxner had been asked to develop his own probable cause for the stop undermines his testimony that law enforcement continuously surveilled defendants between Wright, Wyoming, and the stop location. (Docket 91 at pp. 4-5).

Upon cross-examination by Ms. Hill's counsel, Inv. Mason testified he briefed Lt. Oxner about the investigation into Mr. Kenefick. (Docket 69 at p. 31). He denied Lt. Oxner "was advised to develop his own probable cause for a stop[,]" "during that briefing[.]" Id. Mr. Kenefick's counsel followed up on this line of questioning, asking Inv. Mason if he testified Lt. Oxner "was not asked to develop

his own probable cause to conduct the stop[.]" Id. at pp. 40-41.   Inv. Mason responded that Lt. Oxner "was asked to, if he could find a reason for the stop, to do so" but also stated that UNET believed they "had reasonable suspicion to stop the vehicle" based on their drug investigation.   Id. at p. 41.   Counsel confronted Inv. Mason with a police report showing that "members of the investigative team" asked Lt. Oxner to "develop his own probable cause" and Inv. Mason agreed with the report's version of events.   Id. at pp. 41-42.

There does appear to be a discrepancy between Inv. Mason's testimony under questioning by Ms. Hill's counsel and his testimony to Mr. Kenefick's counsel.   But the discrepancy concerns a minor matter in this case: whether Lt. Oxner was asked to develop his own probable cause for the stop.   Although both defendants make much of this statement, it is not an improper law enforcement technique to use a valid traffic stop as pretext for a different investigation. United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007).   In any event, Inv. Mason did not persist in denying that Lt. Oxner was asked to target Mr. Kenefick for a traffic stop.   He independently admitted it to Mr. Kenefick's counsel, even before being confronted with the police report.   The court finds it likely Inv. Mason misunderstood the question from Ms. Hill's counsel or misremembered the relevant report, rather than that he lied to Ms. Hill's counsel but not Mr. Kenefick's counsel.

The court overrules Mr. Kenefick's objection and agrees with the magistrate judge that Inv. Mason testified credibly. The R&R is adopted on this point.

### B. Probable cause for traffic stop

Ms. Hill objects to the magistrate judge's conclusion that probable cause existed for the traffic stop. (Docket 88 at pp. 3-5). She argues Lt. Oxner did not know Mr. Kenefick was driving without a valid license and that other law enforcement officials never informed Lt. Oxner that Mr. Kenefick was driving the vehicle. The court rejects both arguments and, in the alternative, concludes the underlying drug investigation provided reasonable suspicion to stop the vehicle.

> A traffic stop is a seizure within the meaning of the Fourth Amendment and, as such, must be supported by reasonable suspicion or probable cause. A law enforcement officer has reasonable suspicion to conduct an investigatory stop when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.

United States v. Williams, 929 F.3d 539, 544 (8th Cir. 2019) (internal quotations, citations and alteration omitted). "The more rigorous standard of probable cause exists when the totality of the circumstances justifies the belief that a crime has been committed and the person being seized committed it. In the context of a traffic stop, any traffic violation, however minor, provides probable cause." United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008) (internal quotation and alteration omitted).

Like the magistrate judge, the court concluded both Lt. Oxner and Inv. Mason testified credibly.  See supra Section II.A.  Crediting their testimony, the following facts are established.  Law enforcement officials maintained surveillance of defendants' vehicle between Wright, Wyoming, and the location of the traffic stop near Spearfish, South Dakota.  Officials observed Mr. Kenefick driving the vehicle and passed that information along to Lt. Oxner.  Lt. Oxner then queried a law enforcement database and discovered Mr. Kenefick did not have a valid South Dakota driver's license.[8]  It is illegal in South Dakota to drive without a driver's license.  SDCL § 32-12-22.  These facts gave Lt. Oxner probable cause to stop defendants' vehicle, no matter that his true intention was to investigate a drug conspiracy on behalf of UNET.

Even in the absence of the traffic violation, there was at the very least reasonable suspicion to conduct the vehicle stop based on UNET's investigation into Mr. Kenefick's alleged drug trafficking.  As recounted in the R&R, two sources of information and three confidential informants—all determined to be credible by UNET officers—independently implicated Mr. Kenefick in drug trafficking activities.  (Docket 81 at pp. 2-4).  Four of these informants stated Mr. Kenefick traveled to southern California to acquire methamphetamine.  Id.  One claimed to have personally travelled with Mr. Kenefick to San Ysidro, California, a neighborhood of San Diego directly adjacent to the Mexican border,

---

[8]Cross-examination established Lt. Oxner did not check whether Mr. Kenefick had a driver's license from another state.  (Docket 69 at p. 76).  But it was uncontested Mr. Kenefick resides in South Dakota, so there is no reason to believe he would have had a license from another state.  Id. at pp. 6-7.

12

to purchase methamphetamine.  Id. at p. 3.  In early April 2019, one informant stated Mr. Kenefick would be traveling to California "in the near future" to purchase methamphetamine.  Id. at p. 4.

Based on this information, UNET obtained a search warrant and placed an electronic tracker on Mr. Kenefick's orange Saturn Vue on April 4.  Id.  The tracker showed Mr. Kenefick left South Dakota on April 15.  Id.  Wyoming law enforcement observed Mr. Kenefick and Ms. Hill in Casper, Wyoming, on April 16, with the orange Vue.  Id.  The tracker showed the vehicle arrived in San Ysidro on April 18 and local law enforcement agents confirmed Mr. Kenefick and Ms. Hill were with the vehicle.  Id. at pp. 4-5.  While in San Ysidro, a Drug Enforcement Administration agent confirmed the vehicle entered Mexico.[9] (Docket 69 at p. 38).  The tracker showed Mr. Kenefick driving back toward South Dakota on April 19.  (Docket 81 at p. 5).  Law enforcement observed defendants with the vehicle in Wright, Wyoming, and maintained surveillance until the stop.  Id.

These facts provide ample reason to suspect Mr. Kenefick purchased methamphetamine in California or Mexico and transported it back to South Dakota.  This is not a case where Mr. Kenefick simply traveled to an area where methamphetamine is often purchased.  Law enforcement had specific intelligence that Mr. Kenefick previously purchased methamphetamine in San Ysidro and that he would return for more in April.  He was then observed

---

[9]The tracker shut off at the Mexican border, apparently by design. (Docket 69 at pp. 33-24).

13

traveling to San Ysidro and entering Mexico before immediately returning to South Dakota.  Law enforcement was entitled to stop the vehicle based on this information alone, regardless of whether Mr. Kenefick committed any traffic violations.

Nor does it matter, as Ms. Hill argued in her suppression briefing, that Lt. Oxner was not involved in the drug investigation.  (Docket 79 at pp. 4-6).  A stop "may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication."  United States v. Edwards, 891 F.3d 708, 711-12 (8th Cir. 2018) (internal quotation omitted).  The United States Court of Appeals for the Eighth Circuit has upheld stops where the officer on scene knew nothing but that investigators wanted the vehicle stopped.  United States v. Robinson, 664 F.3d 701, 703-04 (8th Cir. 2011); United States v. Jacobsen, 391 F.3d 904, 907 (8th Cir. 2004).  Here, Lt. Oxner knew that UNET suspected defendants were transporting 10 pounds of methamphetamine, even if he did not know the specifics of the investigation.  He was entitled to rely on that information, as well as UNET's request that he stop defendants' vehicle.

Lt. Oxner had probable cause to stop defendants' vehicle because he knew Mr. Kenefick was driving without a license.  He also had reasonable suspicion to make the stop based on UNET's drug investigation.  Ms. Hill's objection to the contrary is overruled and the R&R is adopted as modified by this order.

14

### C. Ms. Hill's standing to contest search

Ms. Hill's final objection concerns the magistrate judge's conclusion that she had no standing to challenge the search of Mr. Kenefick's vehicle. She asserts Lt. Oxner unconstitutionally stopped the vehicle and searched her person and purse. (Docket 88 at pp. 5-6). The court rejects both arguments.

Ms. Hill is correct that she has standing to contest the vehicle stop as a passenger because it constituted a seizure of her person. Brendlin v. California, 551 U.S. 249, 251 (2007). But, as explained above, the stop was valid. See supra Section II.B. Ms. Hill advances no new argument against the stop that the court did not previously reject.

Ms. Hill also alleges Lt. Oxner improperly seized items from her shirt and her purse. When Lt. Oxner approached the passenger side of the vehicle during the stop, he observed Ms. Hill "shaking" and "eating gummy worms as fast as she could[.]" (Docket 81 at p. 6). He observed a white baggie containing a "dark brown or green substance" "sticking out of the top of her shirt[.]" Id. When Lt. Oxner asked Ms. Hill what was "hidden in her shirt[,]" she "panicked[,] . . . [s]at up in her seat, . . . grabbed whatever it was and then, like, shoved it down further in her shirt[.]" (Docket 69 at p. 66). Lt. Oxner "commanded" Ms. Hill to surrender the bag. Id. at p. 79. Ms. Hill handed the bag to Lt. Oxner "shortly thereafter[.]" Id. at p. 67. Lt. Oxner also seized three items from a blue container found in Ms. Hill's purse. Id. at p. 80.

15

These seizures were constitutional. As detailed above, Lt. Oxner had reasonable suspicion defendants were trafficking drugs before he even stopped the vehicle. See supra Section II.B. When he approached the vehicle, Ms. Hill's actions confirmed that reasonable suspicion and converted it to probable cause. Ms. Hill's nervous demeanor and rapid consumption of gummy worms would have suggested to any reasonable officer that his suspicions of drug trafficking were warranted. The bag containing a dark brown or green substance sticking out of her shirt was equally suspicious. Under these circumstances, "a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Bettis, 946 F.3d 1024, 1030 (8th Cir. 2020) (defining probable cause).

Lt. Oxner's seizure of the bag was justified under the plain view exception to the warrant requirement. Items visible in plain view may be seized without a warrant if "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." United States v. Lewis, 864 F.3d 937, 943 (8th Cir. 2017) (internal quotation omitted). "An item's incriminatory nature is immediately apparent if the officer at that moment had probable cause to associate the property with criminal activity[.]" Id. at 944 (internal quotation and alteration omitted).

Lt. Oxner's stop and subsequent approach of the vehicle was valid, so he did not violate the constitution in arriving at the location from where he could see the bag in Ms. Hill's shirt.  See supra Section II.B.  The bag's incriminating nature was immediately apparent because, given the circumstances of the drug investigation and Ms. Hill's behavior, Lt. Oxner had probable cause to associate the bag with drug activity.  Lt. Oxner had a lawful right to remove the bag from Ms. Hill's hand when she gave it to him.[10]  The seizure of the bag did not violate the Fourth Amendment.

Lt. Oxner also seized Ms. Hill's purse.  The record is not clear as to when or from where the purse was seized.  In response to a question about "what was located in the vehicle[,]" Lt. Oxner stated he seized items from inside Ms. Hill's purse.[11]  (Docket 69 at p. 71).  However, he also stated the purse was located "[w]ith Ms. Hill."  Id. at p. 80.  The court concludes the search was valid under either the automobile or search incident to arrest exceptions.

"Although a warrantless search is usually *per se* unreasonable, probable cause justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  Bettis, 946 F.3d at 1029 (internal quotation omitted).  If the purse were seized from the vehicle, Lt. Oxner was permitted to

---

[10]Whether Lt. Oxner would have had a lawful right to reach into Ms. Hill's shirt to remove the bag is not at issue because she surrendered it to him.

[11]If the purse were seized from the vehicle, the court agrees with the magistrate judge that Ms. Hill lacks standing to contest that search.  (Docket 81 at pp. 12-13).  But because probable cause existed to search the vehicle, the matter of Ms. Hill's standing is irrelevant.  The search was valid, no matter who contests it.

17

search it for drugs. As recounted above, he had probable cause to suspect the vehicle contained drugs or other evidence of drug trafficking.

If the purse was seized from Ms. Hill's person, it was valid as a search incident to arrest. "As a general matter, in a search incident to arrest, police officers are allowed to search not only an arrestee's person for weapons, but also for evidence, and the scope of the search extends to containers found on the person." Basham v. United States, 811 F.3d 1026, 1028 (8th Cir. 2016). The record does not show when Ms. Hill was arrested, but an investigative stop may become an arrest when probable cause is obtained. Waters v. Madson, 921 F.3d 725, 737 (8th Cir. 2019). Lt. Oxner arguably had probable cause to arrest Ms. Hill for drug trafficking when he pulled the vehicle over. But it is clear he had probable cause for an arrest when he observed Ms. Hill shaking, rapidly consuming gummy worms and attempting to hide a bag containing a suspicious material. Lt. Oxner was permitted to seize and search Ms. Hill's purse incident to her arrest.

The court concludes the search and seizure of Ms. Hill's purse and the bag she handed to Lt. Oxner were valid. Ms. Hill's objection is overruled. The R&R is modified consistent with this order.

### III. Conclusion

The court overrules defendants' objections and adopts the R&R as modified by this order. The court denies defendants' suppression motions in full. Each defendant argues evidence later obtained as a result of the stop

18

should be suppressed as fruit of the poisonous tree.  (Dockets 54 at pp. 7-11 & 56 at pp. 6-7).  Because the stop was valid, the court will not suppress evidence derived from subsequent search warrants and statements by defendants.

## ORDER

For the reasons given above, it is

ORDERED that defendants' objections to the magistrate judge's report and recommendation (Dockets 88 & 91) are overruled.

IT IS FURTHER ORDERED that the report and recommendation (Docket 81) is adopted as modified by this order.

IT IS FURTHER ORDERED that defendants' suppression motions (Dockets 53 & 55) are denied.

IT IS FURTHER ORDERED that a scheduling order returning this case to the court's trial calendar shall issue.

Dated April 20, 2020.

                BY THE COURT:

                /s/ *Jeffrey L. Viken*
                JEFFREY L. VIKEN
                UNITED STATES DISTRICT JUDGE